[Cite as *Richardson v. Ohio State Univ. Med. Ctr.*, 2011-Ohio-1853.]

# Court of Claims of Ohio

The Ohio Judicial Center
65 South Front Street, Third Floor
Columbus, OH 43215
614.387.9800 or 1.800.824.8263
www.cco.state.oh.us

ALTHALENE RICHARDSON

    Plaintiff

    v.

THE OHIO STATE UNIVERSITY MEDICAL CENTER

    Defendant
    Case No. 2008-07845

Judge Joseph T. Clark

DECISION

{¶ 1} Plaintiff, Althalene Richardson, brought this action against defendant, The Ohio State University Medical Center (OSUMC), alleging a claim of medical malpractice. The issues of liability and damages were bifurcated and the case proceeded to trial on the issue of liability.

{¶ 2} Plaintiff testified that she learned that she had vascular disease in 1982 after she underwent surgery to her right iliac artery to relieve pain and cramping in her legs. At the time, plaintiff was in her early thirties. In 1990, she underwent a left iliac angioplasty in an effort to relieve her recurrent leg cramps. (Joint Exhibit G, Tab 2.) Plaintiff also admitted that she had a long history of smoking cigarettes, that she had been instructed many times by various doctors to quit, and that she attempted unsuccessfully to quit several times. She first developed leg ulcers in 1995 and these were treated at the Grant Medical Center wound clinic. (Joint Exhibit G, Tab 2.) The wounds were described as large, necrotic ulcers surrounded by ischemic-appearing skin as well as multiple bruises across both feet. Plaintiff was instructed to "stop

smoking entirely" inasmuch as the physician was "certain that her cigarette smoking is exacerbating her ischemia." (Joint Exhibit G, Tab 2.)

{¶ 3} On April 29, 1996, plaintiff underwent a bilateral aorta-femoral bypass due to occlusion of both the right and left iliac arteries. Subsequent to the procedure, plaintiff experienced improved blood flow to both lower extremities and the leg ulcers healed. Plaintiff next presented to the emergency room of Mount Carmel Health Hospital on November 16, 1998, with leg ulcers that she stated had been present for months. Plaintiff admitted that she had resumed smoking cigarettes. (Joint Exhibit I, Tab 1.)

{¶ 4} In May 1999, plaintiff again sought treatment for her leg ulcers from Dr. Starr who expressed concern that the ulcers may have been caused by vasculitis inasmuch as the bypass grafts were patent and plaintiff had strong femoral and dorsalis pedis pulses.[1] (Joint Exhibit G, Tab 2.) Plaintiff experienced another episode of leg ulcerations in June 2000 and, at that time, she was noted to have strong, palpable pulses in both feet. (Joint Exhibit I, Tab 2.)

{¶ 5} Plaintiff next sought treatment in 2002 from Dr. Starr after she suffered injury to a previously-healed ulcer on her ankle; she developed gangrene at her left first and second toes as well. Dr. Starr noted the absence of a palpable pulse in plaintiff's left foot, she performed a left femoral-popliteal bypass, the affected toes were amputated, and plaintiff once again experienced improved blood flow to the left lower extremity.

{¶ 6} During 2003 and 2004, plaintiff sought further treatment at various wound clinics for recurrent leg ulcers. Plaintiff testified that the ulcers would heal and then burst open if she bumped or otherwise injured her legs. She eventually resumed treatment with Dr. Starr at OSUMC in May 2004. At that time, Dr. Starr informed plaintiff that the bypass graft was patent and that she had good pulses in her lower extremities. Plaintiff attributed the prolonged lapses in her treatment with Dr. Starr to the fact that she did not have medical insurance and could not afford to pay Dr. Starr.

{¶ 7} According to plaintiff, she was seen at the OSUMC wound clinic in June and July 2004 for continued treatment of her bilateral leg ulcers. The treatment

included debridement, application of a topical gel, gauze pads, and compression bandages. On July 22, 2004, hyperbaric (topical) oxygen therapy was added to the regimen.

{¶ 8} On July 27, 2004, plaintiff went to the OSUMC emergency room (ER) with the chief complaint of increasing severe pain and the inability to find a pulse in her left foot. (Joint Exhibit B, Tab 1.) Plaintiff recalled that the pain was so severe that she could not walk. On physical examination, Dr. Sayre noted that plaintiff exhibited chronic changes to both feet and his plan of treatment included checking laboratory values and obtaining an arterial brachial index (ABI).[2] Dr. Cheek, who was on call for the general surgery service, also examined plaintiff and discussed his findings with the vascular surgeon on call, Dr. Smead. (Joint Exhibit B, Tab 1.) Dr. Cheek noted the presence of a left DP pulse via Doppler. In addition, he recorded that plaintiff denied numbness of her left foot and that she exhibited normal sensation and motor function as well. He concluded that plaintiff's symptoms were the result of a wound infection or "early cellulitis" and he recommended antibiotics and pain medicine as treatment. Plaintiff was instructed to follow up with Dr. Starr for evaluation, to call for such appointment in the next week, to follow up urgently with the wound care clinic, and to return to the ER if she developed fever, chills, or increase in her foot pain. (Joint Exhibit B, Tab 1.)

{¶ 9} On July 29, 2004, plaintiff returned to the ER complaining of "neuropathic type pain in her left heel and foot." (Joint Exhibit B, Tab 2.) Plaintiff described the pain as sharp, stinging, and burning. Plaintiff was given intravenous narcotic medication which relieved her pain. Dr. Stockdale examined plaintiff and noted that her wounds appeared clean and without drainage. A faint DP pulse was detected on the left foot with a Doppler. Dr. Stockdale discussed his findings with the attending ER physician, Dr. Bahner. According to the ER records, they both discussed plaintiff's care with her treating podiatrist, Dr. Gordon. As a result of that conversation, Dr. Stockdale increased the dosage for plaintiff's pain medication and instructed her to follow up with her podiatrist at the appointment already scheduled for the following week.

---

[1]According to the testimony presented at trial, the dorsalis pedis (DP) pulse is located on top of the foot and the posterior tibial (PT) pulse is palpated in an area behind the ankle.
[2]There is no record of the ABI being performed before plaintiff was discharged.

{¶ 10} On July 31, 2004, plaintiff went to the Grant Hospital ER complaining of pain in both feet and fever. The ER physician contacted Dr. Starr's partner, Dr. Vermillion, who agreed to have plaintiff transferred to OSUMC's ER. The OSUMC ER nurse recorded that plaintiff had bilateral ankle ulcers and that she complained of "pain in those areas and across her feet." (Joint Exhibit B, Tab 3.) The nurse also noted that plaintiff's skin was warm and her nail beds were pink. Plaintiff described the pain as throbbing and burning, and again she stated that the pain was so severe she could not walk. (Joint Exhibit B, Tab 3.) Resident physician Dr. Sheridan noted that the ulcers were not draining or necrotic in appearance, that a left DP pulse was located per Doppler, and that plaintiff's strength, reflexes, and range of motion in both feet were normal. Dr. Huff and the ER attending physician, Dr. Kaide, also examined plaintiff and evaluated her condition. In addition, a vascular surgery consult was requested and plaintiff was examined by Dr. Brown. Based upon their observations and the results of x-rays, the physicians concluded that plaintiff's wounds were not infected, that they were chronic and stable in appearance, and that her increased pain mostly likely resulted from the recent hyperbaric oxygen therapy. Plaintiff received narcotic medication which relieved her pain and she was instructed to follow up with Dr. Starr within one week. (Joint Exhibit B, Tab 3.)

{¶ 11} According to plaintiff, she called on August 2 for an appointment and was scheduled for August 5, 2004. According to the August 2, 2004 office notes, plaintiff complained of "pain in [her left] ankle at ulcer sites-seen at OSU ER over weekend and instructed to make [appointment with] Dr. Starr. States [left] foot is warm but ankle is painful." (Joint Exhibit G, Tab 1.) When plaintiff arrived for her appointment, Dr. Starr observed that plaintiff was "rolling in pain," the left foot and ankle had "much worse ulcers," and Dr. Starr noted "gangrenous changes in [plaintiff's] foot." (Joint Exhibit G, Tab 1.) Plaintiff recalled that once Dr. Starr observed the wounds, she arranged for plaintiff to be transferred immediately to OSUMC and admitted.

{¶ 12} The initial arteriogram on August 5, 2004, showed an occlusion of the left bypass graft but noted that the left popliteal artery had blood flow from collateral circulation and that where the artery split into three branches behind the knee the opening was "small, but patent." (Joint Exhibit C, Tab 12.) The arteriogram also

documented blood flow into the anterior and posterior tibial arteries to the left foot. (Joint Exhibit C, Tab 12.) Dr. Starr attempted to improve blood flow to plaintiff's left lower extremity using a clot-dissolving medication, but a repeat arteriogram conducted on August 6, 2004, showed that although the graft was patent, residual clot remained. In addition, outflow could only be visualized to an area below the level of the knee. (Joint Exhibit C, Tab 12.) A follow-up arteriogram showed some outflow below the knee but noted that the arteries were "small" and that they terminated at the calf level without significant flow to the foot. (Joint Exhibit C, Tab 12.)

{¶ 13} On August 7, 2004, plaintiff's condition deteriorated, her left leg became more ischemic, and Dr. Smead attempted to open the arteries via incision to remove any residual clot in order to restore blood flow to the lower leg. According to the operative report, Dr. Smead retrieved a clot from the popliteal artery; however, he could not retrieve any clot from either the anterior or the posterior tibial arteries. (Joint Exhibit C, Tab 9.) Dr. Smead testified that he was able to establish blood flow through the graft but that the blood vessels below the knee were so hardened and sclerotic that the blood no longer flowed readily through those vessels. He described the condition as a lack of "outflow" or "runoff" from increased resistance caused by the progressive tibial artery disease in the vessel walls. Despite all of these interventions, plaintiff lost the feeling in and function of her left foot, her lower limb became acutely ischemic, and ultimately plaintiff underwent a left above-the-knee amputation on August 9, 2004. The pathology report described ulcerations on the anterior, posterior, medial, and lateral areas of the leg including two on the bottom of the left foot. In addition, the pathologist noted that the "anterior and posterior tibial vessels show greater than 75% of stenosis." (Joint Exhibit C, Tab 13.)

{¶ 14} Plaintiff contends that the care and treatment rendered to her by defendant's vascular surgery physicians on July 27, 29, and 31, 2004, fell below the accepted standard of care in that they failed to consider whether plaintiff's graft was occluded on those dates. Plaintiff posits that had they done so, they would have discovered that the graft was thrombosed, and plaintiff would have received earlier intervention with improved pain management, and that her leg would not have to have

been amputated. Defendant maintains that its employees met the standard of care whenever plaintiff presented to the ER for treatment.

{¶ 15} "In order to establish medical malpractice, it must be shown by a preponderance of the evidence that the injury complained of was caused by the doing of some particular thing or things that a physician or surgeon of ordinary skill, care and diligence would not have done under like or similar conditions or circumstances, or by the failure or omission to do some particular thing or things that such a physician or surgeon would have done under like or similar conditions and circumstances, and that the injury complained of was the direct result of such doing or failing to do some one or more of such particular things." *Bruni v. Tatsumi* (1976), 46 Ohio St.2d 127, paragraph 1 of the syllabus.

{¶ 16} Plaintiff's expert vascular surgeon, Dr. Kaj Johansen, testified that he is board-certified in vascular surgery and that he spends more than 75 percent of his professional time in the active clinical practice of medicine. Dr. Johansen noted that plaintiff had fairly normal blood flow to her lower extremity after her bypass graft in 2002. He testified that he believed that the graft started to become occluded by a clot, probably on or about July 26, 2004. He stated that plaintiff's sudden onset of acute pain was indicative of a severe reduction in blood flow which necessitated intervention.

{¶ 17} According to Dr. Johansen, plaintiff's description of pain in the sole of her foot on July 27, 2004, signaled that the graft had become occluded and that plaintiff's inability to feel her pulse also signaled impaired blood flow. Although plaintiff's pulse was documented as present via Doppler, Dr. Johansen attributed such to collateral blood flow which was keeping the limb alive. Dr. Johansen explained that once the blood flow to the lower leg is diminished, the blood does not return to the heart as normal but instead becomes stagnant and tends to form clots in the smaller branches of the vessels supplying the ankle and foot. Dr. Johansen maintained that if the clot in the bypass graft had been detected in the early stages of formation, plaintiff could have received anticoagulants to thin the blood and prevent this stagnant clotting condition.

{¶ 18} Dr. Johansen opined that the standard of care required that an ABI be performed to evaluate whether the graft had failed and that, if the results were abnormal, plaintiff should have been admitted to the hospital non-emergently for pain

medication and blood-thinners. According to Dr. Johansen, an ABI is determined by measuring the blood pressure at the ankle and dividing that result by the blood pressure in the arm. Normally, the measurements should be the same, such that the ABI would be 1. Indeed, Dr. Johansen noted that plaintiff's ABI measured by Dr. Starr in May 2004 was recorded as 1, a normal value.

{¶ 19} Dr. Johansen further opined that, the surgical resident failed to effectively communicate with Dr. Smead on July 27 such that, plaintiff did not receive the proper diagnosis and thus did not receive treatment in a timely fashion. He offered the same opinion as to the care and treatment rendered on July 29 and concluded that, had plaintiff received proper anticoagulation therapy on that date, in all probability her limb would have been saved. According to Dr. Johansen, when a clot forms, it initially has the consistency of jelly but that over time, the clot dries out and hardens to a substance more like chunky peanut butter. He explained that this is significant in that the clot becomes much harder to remove or to dissolve, and that it tends to break up into chunks which then travel downstream and clog the smaller, more distal arteries.

{¶ 20} Dr. Johansen also opined that there was a deviation from the standard of care again on July 31, in that the vascular consult was performed by a resident with limited experience who failed to appreciate, in light of her history of bypass graft operation, the nature and significance of plaintiff's complaints of pain at rest and inability to bear weight on the affected leg. Dr. Johansen testified that he had no criticism of Dr. Starr and that her treatment of plaintiff met the standard of care at all times. In addition, Dr. Johansen testified that he was not offering opinions as to the care rendered to plaintiff by emergency room physicians, but only about those who provided vascular surgery consults at OSUMC during the ER visits.

{¶ 21} On cross-examination, Dr. Johansen admitted that plaintiff's intact motor and sensory function of her left foot signified that plaintiff had severe, but not acute, arterial insufficiency such that the limb was not threatened either on July 27, 29, or 31. In addition, Dr. Johansen agreed that plaintiff did not demonstrate gangrenous changes on the ER visits, and that gangrenous changes were first noted by Dr. Starr on August 5, 2004. He confirmed that plaintiff had progressive atherosclerosis and that her condition was especially progressive in that she had continued to smoke for several

years. He acknowledged that the pathology report on the amputated tissue demonstrated atherosclerosis of the tibial arteries but he disputed that it equated with small vessel disease or was indicative of an "outflow" problem as asserted by Dr. Smead.

{¶ 22} Defendant's expert, Dr. Peter Faries, testified that he is board-certified in vascular surgery and that he spends nearly 80 percent of his time in the active clinical practice of medicine. He opined that the physicians employed by OSUMC on the vascular surgery team met the standard of care at all times that they provided care to plaintiff on July 27, 29, and 31, 2004. Dr. Faries noted that plaintiff had an extensive history of complications from severe and progressive atherosclerosis which caused hardening of the arteries and diminished blood flow to her lower extremities. He opined that the chronic lack of sufficient oxygen and nutrients resulted in the prolonged healing of plaintiff's ulcers. Dr. Faries based his opinion, in part, upon the pulse volume recording taken by Dr. Starr at the May 2004 office visit which documented reduced blood flow caused by hardening of the distal arteries. Essentially, Dr. Faries determined that plaintiff had demonstrated disease of the aorta, as well as the iliac, femoral, and popliteal arteries, and that the disease eventually affected the tibial arteries as well.

{¶ 23} Dr. Faries explained that once plaintiff presented to the ER with pain on July 27, the evaluation was made that plaintiff did not need immediate admission to the hospital and that her ulcers could be treated more effectively during an office visit either to Dr. Starr or to the wound clinic. Thus, the treatment in the ER focused on relieving the pain, assessing the wounds to check for signs of infection, and determining that the limb was receiving adequate blood flow in that the tissues were pink and warm, that pulses were present, and that there was no neurological or motor impairment. Dr. Faries opined that the standard of care did not require that an ABI be performed in the ER. He testified that the test is commonly used by vascular surgeons in an office setting as a guide for a long-term plan of care. He further opined that the standard of care was met by the vascular surgery resident on July 27 when he instructed plaintiff to follow up with the wound care clinic at the appointment already scheduled for the next day and to make an appointment to see Dr. Starr the following week.

{¶ 24} Dr. Faries opined that the standard of care was met during the visit of July 29 in that the assessment of plaintiff's leg for signs of ischemia had not changed; thus, that plaintiff's condition was stable and she did not require a vascular surgery consult. He further opined that it was appropriate to contact plaintiff's podiatrist, to discuss plaintiff's symptoms with him, and to formulate a plan of care to manage plaintiff's pain. This included modifying the pain regimen to increase the dosage of Neurontin for better baseline control of neuropathic pain and to provide more effective breakthrough medication as well.

{¶ 25} As for the July 31 visit, Dr. Faries testified that plaintiff again complained of pain and that the vascular surgery department was consulted. The vascular surgery resident observed that the limb was warm to the touch; he documented that pulses were obtained via Doppler; and he noted plaintiff had intact motor and sensory function as well. Thus, according to Dr. Faries, plaintiff's vascular status was stable and there was no indication of necrotic tissue or gangrene in the left lower leg. The vascular surgery resident communicated his findings to the senior resident and to the attending vascular surgeon. Dr. Faries opined that the care and treatment provided by the resident met the standard of care as did the recommendation for plaintiff to follow up with her vascular surgeon.

{¶ 26} According to Dr. Faries, the emergency room records do not document evidence of graft occlusion. In Dr. Faries' opinion, there is no way to know the specific date or time when the graft occlusion occurred, only that an occlusion was detected by ultrasound on August 5 in Dr. Starr's office. According to Dr. Faries, thrombolysis is most likely to be successful if administered within fourteen days after a clot forms; however, he testified that there is no change in outcome when one starts treatment at day one as opposed to day fourteen regarding whether the clot will respond and dissolve. Dr. Faries then opined that the administration of thrombolytic agents prior to August 5, even if administered as early as July 27, would not have had any impact on the likelihood of success in dissolving the clot or salvaging the limb due to the progressive and severe nature of plaintiff's disease.

{¶ 27} In essence, Dr. Faries opined that it was inevitable that plaintiff's graft would become occluded and that she would lose her limb due to the severe stricture or

narrowing that existed in the tibial arteries. Dr. Faries based his opinion, in part, upon the pathology report which noted the presence of a high degree of stricture in the tibial arteries.

{¶ 28} Based upon a review of the testimony presented, the court finds that plaintiff has failed to prove by a preponderance of the evidence that defendant was negligent or that defendant's care and treatment of plaintiff fell below the standard of care. The court is convinced that plaintiff's condition was chronic, and was complicated by the presence of multiple factors that caused her to suffer severe pain, including neuropathic pain and pain from the open, ulcerated areas on her legs. In addition, the general and vascular surgery residents consulted with senior residents and attending physicians and each physician who observed plaintiff or who participated in discussions concerning her condition agreed that she did not need to be admitted to the hospital, that the limb was not threatened, and that she should be seen and evaluated by Dr. Starr in her office.

{¶ 29} Prior to trial, plaintiff filed a motion in limine seeking to prohibit plaintiff's treating physicians, Drs. Starr, Smead, and Vermillion, from offering expert testimony. In support of the motion plaintiff states that "none of these treating physicians was ever identified as an expert witness on the issues of standard of care or proximate cause. In addition, no reports from those treating physicians were ever provided to Plaintiff's counsel concerning any opinions of those treating physicians on the issues of standard of care or proximate cause." In its response to the motion, defendant asserts that the named treating physicians were identified and disclosed to plaintiff via defendant's Notice of Disclosure of Experts which was filed on June 16, 2009. In the notice, defendant lists the treating physicians and states that any of the witnesses "may testify beyond their own treatment on issues of negligence, proximate cause, and damages." In addition, defendant notes that plaintiff's counsel was present and participated in the depositions of the named physicians.[3] L.C.C.R.7(E) states in pertinent part that: "In the event the expert witness is a treating physician, the court shall have the discretion to determine whether the hospital and/or office records of that physician's treatment which have been produced satisfy the requirement of a written report."

{¶ 30} At the close of proceedings, plaintiff's counsel made an oral argument regarding the motion in limine and stated that the objection to opinion testimony from plaintiff's treating physicians was limited to their offering expert opinions as to proximate cause. Inasmuch as the court finds that defendant's employees met the standard of care at all times that they provided care and treatment to plaintiff, the court need not reach the issue of proximate cause. See *McNeilan v. OSUMC,* Franklin App. No. 10AP-472, 2011-Ohio-678, ¶47. For all of the foregoing reasons, the court hereby denies plaintiff's motion in limine.

{¶ 31} Plaintiff's counsel also made an oral argument requesting that the court disregard any mention of Buerger's disease as referenced in plaintiff's medical records inasmuch as plaintiff was never given such diagnosis and the reference relates to a skin biopsy. For the purposes of this decision, the court did not rely on any reference to Buerger's disease in determining the findings of fact and conclusions of law contained herein.

{¶ 32} Finally, plaintiff's counsel requested that the court issue a directed verdict; specifically that the failure of the vascular surgery team at OSUMC to include graft occlusion as a differential diagnosis caused plaintiff to suffer nine days of unnecessary pain in that, had they discovered that the graft was occluded, plaintiff would have been admitted to the hospital for pain management and would have received thrombolytic treatment sooner. Upon review, the court finds that plaintiff's argument is not supported by the testimony and evidence adduced at trial. The experts disagreed upon whether plaintiff's symptoms were attributable to graft occlusion. Indeed, the court finds that plaintiff had multiple, severe ulcerations which in-and-of themselves caused her to suffer repeated bouts of agonizing pain, which are well-documented in the medical records. Moreover, the court is persuaded by the testimony, and especially by the testimony of defendant's expert, that the course of treatment provided to plaintiff met the standard of care at all relevant times.

{¶ 33} For the foregoing reasons, the court finds that plaintiff has failed to meet her burden of proof and, accordingly, judgment shall be rendered in favor of defendant.

---

[3]Moreover, during the depositions, plaintiff's counsel asked questions both of Drs. Smead and Vermillion

# Court of Claims of Ohio

The Ohio Judicial Center
65 South Front Street, Third Floor
Columbus, OH 43215
614.387.9800 or 1.800.824.8263
www.cco.state.oh.us

ALTHALENE RICHARDSON

     Plaintiff

     v.

THE OHIO STATE UNIVERSITY MEDICAL CENTER

     Defendant
     Case No. 2008-07845

Judge Joseph T. Clark

<u>JUDGMENT ENTRY</u>


     This case was tried to the court on the issue of liability. The court has considered the evidence and, for the reasons set forth in the decision filed concurrently herewith, judgment is rendered in favor of defendant. Court costs are assessed against plaintiff. The clerk shall serve upon all parties notice of this judgment and its date of entry upon the journal.


                                   _____
                                   JOSEPH T. CLARK
                                   Judge

cc:

---

that elicited their opinions as to the issues of standard of care and proximate cause.

David I. Shroyer
536 South High Street
Columbus, Ohio 43215

Stephen P. Griffin
Special Counsel to Attorney General
825 South Main Street
North Canton, Ohio 44720

John M. Alton
88 West Main Street
Columbus, Ohio 43215-5097

Paula Luna Paoletti
Assistant Attorney General
150 East Gay Street, 18th Floor
Columbus, Ohio 43215-3130

SJM/cmd
Filed March 23, 2011
To S.C. reporter April 12, 2011